[No. D007568. Fourth Dist., Div. One. Feb. 28, 1989.]

Conservatorship of the Person of ROBERT LANCE JONES.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
ROBERT LANCE JONES, Objector and Appellant.

COUNSEL

Peter W. Singer, under appointment by the Court of Appeal, for Objector and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Claudia Fitzpatrick, Deputy County Counsel, for Petitioner and Respondent.

OPINION

**HUFFMAN, J.**—When Robert Lance Jones was due to be released on parole from a state prison commitment, the authorities at the facility where he was housed, Atascadero State Hospital, determined his existing mental

illness would in all likelihood prevent him from completing parole successfully. Accordingly, they referred his case to the County of San Diego for assistance in establishing a conservatorship under the Lanterman-Petris-Short Act (LPS Act). (See Welf. & Inst. Code, § 5000 et seq.)[1] Such a conservatorship was established and Jones was placed at Patton State Hospital. Shortly before the statutory one-year period expired, his conservator sought to reestablish the conservatorship under section 5361. Finding him still gravely disabled under the LPS Act, the court granted the petition. Six months later, Jones moved for rehearing under section 5364, seeking to terminate the reestablished conservatorship. His request was denied.

▪ Jones appeals the order denying his request to end the conservatorship, contending the trial court erred at the rehearing when it ruled the Department of Corrections (Corrections) did not qualify as a "responsible third person providing all his needs," and when it referred to the future circumstance of his eventual release from parole before it ruled his conservatorship should be maintained. Here, as before the trial court, he argues his custodial status as a parolee obviates the need for a conservatorship. According to Jones, because Corrections had the duty to provide him supervision and housing during his period of parole when he could not be released due to mental illness, it therefore qualifies as a third party falling under the judicially created definition of "third party assistance" which has been found to preclude the finding of grave disability that is required to establish and maintain a conservatorship under the LPS Act. (See, e.g., *Conservatorship of Early* (1983) 35 Cal.3d 244 [197 Cal.Rptr. 539, 673 P.2d 209]; *Conservatorship of Davis* (1981) 124 Cal.App.3d 313 [177 Cal.Rptr. 369], and cases following.)

The LPS Act sets forth a comprehensive scheme for involuntary evaluation and treatment of persons found to be "gravely disabled." (§ 5000 et seq.) A person is "gravely disabled" under the LPS Act if, as a result of a mental disorder, he or she is unable to provide for basic personal needs for food, clothing, or shelter. (§ 5008(h)(1).) ▪ The Supreme Court has stated the statutory phrase, "unable to provide for his basic needs for food, clothing, or shelter," was "intended to encompass a consideration of whether the person could provide these basic needs with or without the assistance of willing and responsible family members, friends, or other third parties." (*Conservatorship of Early, supra,* 35 Cal.3d at p. 254.) ▪ Thus the legal issue before us is squarely presented: Does Corrections fit the definition of "third party assistance" under the LPS Act?

Despite being furnished with a minimal record and little briefing on Jones's extensive history of treatment and commitment, we have no

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified. When referring to statutory subparts in the Welfare and Institutions Code or any other code we omit repetition of the word "subdivision."

difficulty in deciding Corrections has no place in such a scheme. We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

The question whether Corrections qualified as a provider of third party assistance within the meaning of the LPS Act was presented to the trial court as an abstract legal issue. Jones filed no points and authorities to assist the court at the rehearing and made no showing of any change in his condition or in the third party resources available to him since the time of the reestablishment of his conservatorship six months earlier. Instead, Jones relied solely upon the stipulated fact of his Corrections custody to argue the issue. Consequently, the factual record of his extensive history of custody and treatment in various state correctional and hospital institutions was not developed either at that hearing or in the briefs on appeal. To the extent necessary to discuss the issues presented, we will outline the procedural background of the case as determined by judicial notice of the superior court file. (Evid. Code, §§ 452(d)(1), 459(a).)

Jones's conservatorship was initiated in March 1986 by an ex parte petition for appointment of temporary conservator brought by the Counselor in Mental Health in San Diego County, upon a recommendation made by Dr. Gritter, the clinical and medical director of Atascadero State Hospital.[2] According to the conservatorship investigation report, Jones had been transferred from Corrections (Vacaville) to Atascadero as a mentally ill prisoner pursuant to Penal Code section 2684 with the explanation on his transfer sheet, "Therapy needed by patient not available in prison systems." Dr. Gritter's recommendation for conservatorship was motivated by the impending completion of Jones's prison term; on March 13, 1986, his parole from a sentence for petty theft with prior convictions was to begin. However, in Dr. Gritter's opinion, Jones still required institutionalization.

The petition for appointment of temporary conservator was granted and the matter set for trial. Jones was determined to be gravely disabled under the LPS Act and the judgment entered May 13, 1986, found a state hospital was the least restrictive placement available for him.[3] Jones was placed in Patton State Hospital, where he had been transferred from Atascadero.[4]

---

[2] Section 5352.5, "Initiation of Proceedings; reimbursement," enacted in 1986, now specifically authorizes this type of action by a state hospital medical director; however, it was not yet in effect when Jones's conservatorship was initiated.

[3] An earlier reported decision by this court, *Conservatorship of Jones* (1986) 188 Cal.App.3d 306 [232 Cal.Rptr. 600], affirmed this initial judgment over jurisdictional challenges unrelated to this appeal.

[4] The superior court file shows Jones's original transfer from state prison to Atascadero was accomplished under Penal Code section 2684, governing the treatment of mentally ill prisoners. However, it is unclear whether Jones's transfer from Atascadero to Patton in "early

Shortly before the one-year statutory period of conservatorship was to elapse, Jones's conservator filed a petition to reestablish the conservatorship and a second court trial was held June 4, 1987. The court heard testimony by a mental health expert and disjointed and delusional testimony by Jones. Inquiries about Jones's family support system showed he didn't know what his family would say about his situation, as he never really called them about it. The court made findings of grave disability and again designated a state hospital as the least restrictive alternative placement.

Nearly six months later, Jones's attorney moved for rehearing on whether Jones was able to provide for his basic personal needs and set a "special motion" for which no supporting papers were ever filed. At the rehearing held February 2, 1988, the parties stipulated Jones was subject to the jurisdiction of the criminal court and was still being held in the criminal section of Patton State Hospital. Jones argued since Corrections was providing the necessities of life for him, it constituted a "responsible third person providing all his needs" within the meaning of applicable case law such that no conservatorship was required (relying on *Conservatorship of Early, supra,* 35 Cal.3d 244; *Conservatorship of Davis, supra,* 124 Cal.App.3d 313, and cases following.) The court disagreed and denied the requested relief, finding restrictive custody was not in and of itself a basis for terminating the conservatorship under "Mary Davis." (I.e., under *Conservatorship of Davis, supra,* 124 Cal.App.3d 313.)

Since the time of the rehearing, Jones's status has changed to the extent that a new petition to reestablish the conservatorship is pending; he has left Patton State Hospital but is still "in some way under the supervision of the Department of Corrections," according to the reply brief. His parole will expire March 13, 1989.

---

1986" (according to a medical report prepared Sept. 3, 1986) was accomplished when he was a prisoner still subject to Penal Code section 2684, or when he was technically on parole although still in custodial care. Appellant's reply brief states Jones was placed at Patton by Corrections. The respondent's brief states Jones was placed at Patton by his conservator under the LPS Act, and further refers to a "finding" Jones was placed at Patton pursuant to Penal Code section 2974, governing gravely disabled parolees. However, no such "finding" by Corrections or by the court appears in the record or superior court file. The only such statutory reference is a letter in the superior court file from a Patton official to Jones's conservator referring to his "dual commitment" under Penal Code section 2960 and conservatorship. This record is thus inadequate to support Jones's argument, raised by correspondence to this court and at oral argument, that *People* v. *Gibson* (1988) 204 Cal.App.3d 1425 [252 Cal.Rptr. 56] (petition for review denied Feb. 2, 1989) is controlling. In *Gibson,* the court found unconstitutional portions of Penal Code sections 2962 through 2980, and is thus not on point here.

In any case, the exact sequence of events is not determinative of our analysis of the legal issue presented, specifically whether Corrections may supply "third party assistance" within the meaning of the LPS Act.

DISCUSSION

I

*Appealable Order*

■ Preliminarily we note the order appealed, the denial of the requested relief at the rehearing, does not fall precisely within the scope of Probate Code section 2750 defining appealable orders in the conservatorship context.[5] However, it may fairly be construed as an appealable order after judgment under Probate Code section 2750(a), as an order refusing to revoke the letters of conservatorship, or under Probate Code section 2750(n), as an order refusing to remove the conservator.

■ Although this appeal is arguably moot since Jones's reestablished conservatorship was terminated by operation of law during the pendency of this appeal due to the lack of a timely petition to renew,[6] both parties urge this court to address the issues of public interest presented since they are capable of repetition and should not evade review on a particular set of facts. We agree these issues may be resolved. Many appellate courts dealing with conservatorship matters have exercised inherent discretion to consider appeals to avoid dismissals on technical grounds or for mootness, since a stricter policy might tend to allow issues of important public interest to evade review. (*Conservatorship of Forsythe* (1987) 192 Cal.App.3d 1406, 1409 [238 Cal.Rptr. 77]; *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010, 1015 [234 Cal.Rptr. 724]; *Conservatorship of Moore* (1986) 185 Cal.App.3d 718 [229 Cal.Rptr. 875].) Under the circumstances here, we find the appeal is neither moot nor defective. (*Conservatorship of Wilson* (1982) 137 Cal.App.3d 132, 136 [186 Cal.Rptr. 748].) Further, the collateral consequences remaining after the termination of a conservatorship (such as legal questions arising from the period of incapacity and potential social stigma) justify review. (*Ibid.*)

II

*Determination of Grave Disability: Criteria*

■ Jones's main contention is the court erred when it found his conservatorship was still required even though he was in the custody of Corrections and was receiving its assistance in providing the necessities of life. He

---

[5] In California Conservatorships (Cont.Ed.Bar 1983 2d ed.) section 8.74, page 555, the authors explain Probate Code sections 2750-2752 apply since the LPS Act contains no rules for appeal.

[6] We are told by Jones's reply brief a new petition to reestablish the conservatorship was filed pending this appeal.

relies on case law expanding the statutory definition of "gravely disabled" to support his assertion Corrections should be considered a third party responsible for providing for his basic personal needs. (*Conservatorship of Davis, supra,* 124 Cal.App.3d 313; *Conservatorship of Neal* (1987) 190 Cal.App.3d 685, 687-688 [235 Cal.Rptr. 577].)

■ In this context, and as noted earlier, section 5008(h)(1) defines "gravely disabled" as unable as a result of mental disorder to provide for basic personal needs for food, clothing, or shelter.[7] Interpreting this section, the court in *Conservatorship of Davis, supra,* 124 Cal.App.3d 313, held: "[A] person is not 'gravely disabled' within the meaning of section 5008, subdivision (h)(1) if he or she is capable of surviving safely in freedom with the help of willing and responsible family members, friends *or third parties.*" (Italics added.) (*Id.* at p. 321.) It based this holding on language in *O'Connor* v. *Donaldson* (1975) 422 U.S. 563 [45 L.Ed.2d 396, 95 S.Ct. 2486], where the United States Supreme Court recognized the constitutional right of a nondangerous individual who is capable of surviving safely in freedom, with or without the help of willing and responsible family and friends, to live free of custodial confinement for mental illness.

The California Supreme Court in *Conservatorship of Early, supra,* 35 Cal.3d 244, 250, accepted the reasoning in *Davis* and concluded although a person might be gravely disabled if left to his or her own devices, he or she may be able to function successfully in freedom with the support and assistance of family and friends. The court recognized almost everyone depends to a greater or lesser extent upon others in order to survive in our complex society. (*Ibid.*)

Numerous cases since *Davis, supra,* 124 Cal.App.3d 313, and *Early, supra,* 35 Cal.3d 244, have expanded upon the procedural safeguards (e.g., jury instructions) to be accorded nondangerous conservatees to allow their showing of available third party assistance in the community, potentially allowing them to maintain a noncustodial status, to be properly evaluated by a fact finder. (See, e.g., *Neal, supra,* 190 Cal.App.3d 685; *Wilson, supra,* 137 Cal.App.3d 132; *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082 [242 Cal.Rptr. 289].) "Third party assistance" in these cases has been construed to include spouses (*Davis*), common law spouses (*Neal*), siblings (*Early*), and/or parents (*Wilson; Walker*). Thus far, only the help of family members has been recognized as the type of "safety net" third party assistance which may preclude a finding of grave disability.[8]

---

[7] This record does not show Jones falls under the alternate definition of "gravely disabled" found in section 5008(h)(2), i.e., having been found mentally incompetent under Penal Code section 1370 to stand trial.

[8] The statutes governing the related matter of the selection of a conservator also give preference to family members. (See §§ 5355, 5350(b); Prob. Code, § 1812.)

■ Some clarification of the definition of third party assistance was provided by *Conservatorship of Law* (1988) 202 Cal.App.3d 1336, 1341 [249 Cal.Rptr. 415]. That case held a board and care facility in which a conservatee had been placed for treatment was not a provider of "third party assistance," since its services were not made available to the conservatee until after the grave disability finding had been made. Similarly, the conservatee's mother, who acted as payee for the public support check, was found not to be a provider of "third party assistance" since she too was only giving assistance as a result of the grave disability finding. *Law* properly focused upon the preexisting availability of assistance at the time the initial disability determination was made.

All of the above authority merely requires the trier of fact to consider any available "assistance" before making a finding of grave disability. In Jones's case, however, he was in Correction's custody at the time the grave disability finding was made.[9] Neither *Davis,* nor any of the cases following it, are on point as to persons in the custody of Corrections, since such persons lack the freedom and liberty interests which *Davis* and its progeny sought to protect.

■ Therefore, since case authority is not dispositive of Jones's contention, we turn to an analysis of the statutes controlling Corrections custody to determine if that custody is sufficiently analogous to the "safety net" envisioned in the *Davis* line of cases to qualify as "third party assistance."

III

*Department of Corrections Is Not a Provider of "Third Party Assistance"*

For the purpose of discussing the definition of third party assistance, the determinative fact in the record before us is Corrections's request for assistance from the County of San Diego to establish a conservatorship for Jones. Corrections made this request since it believed Jones's mental illness not only prevented him from functioning successfully in custody but would also likely make it impossible for him to complete parole without intensive supervision. Corrections thus recognized ordinary parole supervision is no substitute for an LPS Act conservatorship.

---

[9] Under *Conservatorship of Law, supra,* 202 Cal.App.3d 1336, it might have been possible for the trial court to consider whether Corrections was available as "third party assistance" when the various disability findings were made. However, this would only have been proper if Corrections met the case law criteria for "assistance," which, as we shall explain, it does not. In any case, the record does not demonstrate that third party assistance was a factor raised or considered at any hearing before the rehearing, where it was properly rejected. (See discussion, *infra.*)

Nevertheless, during his parole, Jones remains subject to Corrections's custody. Because case law defining third party assistance has not arisen in a factual context including parolees, we examine the statutes governing such custody.

To begin, Penal Code section 1170(a)(1) provides a clear statement of the legislative purpose which sent Jones to prison in the first place: "The Legislature finds and declares that the purpose of imprisonment for crime is punishment. . . ." Different legislative policies suited to Jones's impaired condition then came into play during his transfers from state prison to Atascadero and later to Patton State Hospital; these policies are expressed in Penal Code section 2650, placing the persons of prisoners under the protection of the law, and in Penal Code section 673, prohibiting cruel and unusual punishment. This requirement of humane treatment of prisoners is of constitutional dimension. (Cal. Const., art. I, § 17.)

Jones's parole status also must be assessed under the legislative policy statement appearing in Penal Code section 3000: "The Legislature finds and declares that the period immediately following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. *It is in the interest of public safety* for the state to provide for the supervision of and surveillance of parolees and to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge." (Italics added.) The chief concern of Penal Code provisions governing prisoner-parolees is public safety.[10]

Although the Legislature included in the LPS Act provisions to promote public safety (see § 5001(c)), its main goal in enacting this legislation was to provide protection and therapy for persons found to be gravely disabled. Specifically, section 5001(b) provides for prompt evaluation and treatment of conservatees; subdivision (e) of that section provides for individualized treatment, supervision and placement; subdivision (g) states the goal of protecting conservatees from criminal acts; and subdivision (f) gives a statement of intent to encourage full use of all available alternatives to accomplish these objectives without duplication of services and unnecessary expenditures. Similarly, the Penal Code provisions cited above, regulating the treatment of mentally ill prisoners, are primarily protective measures.

Our analysis must distinguish between the custodial function of Corrections, geared toward promoting public safety, and the protective function of the LPS Act and similar provisions for the treatment of mentally ill prisoners. In the latter cases, state agencies are required to insure that the obliga-

---

[10]Since it appears Jones does not fall within the scope of Penal Code section 2960 et seq., its public safety declarations do not apply.

tions of protecting individuals in need of care and treatment are fulfilled where "willing and responsible" family members are unable to do so. When such individuals happen into the custody of Corrections, its custodial function is not transformed into a protective one of the sort recognized by the *Davis* line of cases, except to the extent required to protect the prisoner from further harm in the custodial setting. Corrections, even if on the scene when a prisoner is found to be gravely disabled, cannot reasonably be found to provide the same type of volitional, altruistic care which family or friends can supply.

As Corrections here recognized by seeking assistance to establish a conservatorship for Jones, its duties are far more limited. We find no rationale in the LPS Act or case authority to justify casting Corrections in the third party assistance role proposed by Jones.

## IV

### *Present Disability Requirement*

We now turn to Jones's additional contention the trial court erred when it referred to the future termination of his parole in denying the requested relief at rehearing. The court commented at that time: "The question is here, if you want to put it that way, does the Department of Corrections and the Parole Division in particular, love Mr. Jones to the point that, if left to his own devices, they are going to pick up the slack. And all you have to do is look at what happens to parolees when they get out of jail, and you can readily see that the Department of Corrections' love and affection doesn't carry that far." Jones argues these statements show the court improperly relied upon the possibility of future grave disability to justify denying his request to terminate his conservatorship.

The pivotal issue presented to the court on rehearing was whether Jones was "presently" gravely disabled at the time of the ruling, such that his status as a conservatee should be changed. (§ 5364; see *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15 [184 Cal.Rptr. 363] and *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030 [226 Cal.Rptr. 33].) A perceived likelihood of future relapse, without more, is not enough to justify establishing a conservatorship. (*Conservatorship of Neal, supra,* 190 Cal.App.3d 685, 689.) Neither can such a likelihood justify keeping a conservatorship in place if its subject is not presently gravely disabled, in light of the statutory provisions allowing rehearings to evaluate a conservatee's current status.

At this rehearing, no issue was raised or considered whether any danger of future relapse was anticipated, as there was no dispute Jones was

presently disabled at that time. When the judgment reestablishing Jones's conservatorship was entered, it was supported by substantial evidence of his continuing grave disability, in the form of testimony which is part of this appellate record. No evidence of any change was presented at the rehearing and the trial court properly refused to disturb that judgment.

The trial court's comments quoted above are properly interpreted as its explanation why Jones's argument regarding third party assistance did not make sense. They do not show improper factors entered into the court's ruling, which we find was based on Jones's present, not future, condition.

## V

### Conclusion

Corrections custody does not qualify as third party assistance under the LPS Act as interpreted by case law. Since no other grounds for termination of the conservatorship were offered, the trial court's order on rehearing was correct.

The order is affirmed.

Kremer, P. J., and Froehlich, J., concurred.