Filed 8/29/13  Conservatorship of O.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of O.R. | |
| JANET WALKER-CONROY, as Conservator, etc., | C070235 |
| Petitioner and Respondent, | (Super. Ct. No. PMH20110123) |
| v. | |
| O.R., | |
| Objector and Appellant. | |

O.R. is a conservatee under the Lanterman-Petris-Short Act (the Act) (Welf. & Inst. Code, § 5000 et seq.).[1]  She appeals a trial court finding that she is gravely disabled as a result of a mental disorder and is unable to provide for her basic personal needs of food, shelter or clothing.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

O.R. claims there is no substantial evidence to support the trial court's decision to grant a permanent conservatorship. Disagreeing, we will affirm the judgment.

BACKGROUND

O.R. was diagnosed with schizoaffective disorder, bipolar type. Her history of psychiatric hospitalizations began in 2003. There were also repeated hospitalizations in 2008. Between January 2011 and August 2011, O.R. was admitted to the El Dorado County Psychiatric Health Facility (Facility) nine times. In each commitment, she had periods of noncompliance with her treatment or left without leave. Upon release from each commitment, the Facility offered her outpatient services and advised her to continue taking her prescribed medications. Each time, she failed to contact outpatient services, stopped taking her medication and decompensated, resulting in another hospitalization. Dr. Price, the medical director at El Dorado County Health Services, opined that O.R.'s history -- including noncompliance with medication recommendations, limited insight into her mental illness and impaired judgment -- rendered her unable to provide for her food, clothing and shelter needs.

The Facility admitted O.R. on a section 5150 hold in January 2011. She had a history of prior hospitalizations and was diagnosed with schizophrenia, paranoid type. She believed machines were going to hurt her and her boyfriend was trying to kill her because he would not drive her away from the machines. She stated it was not safe for her to go home. She claimed she had been taking her medication, but she had a full medication bottle with no tablets missing. She had a history of methamphetamine use and tested positive for amphetamine and benzodiazepines.

O.R. was six months pregnant at the time. While at the Facility, she was disruptive and uncooperative. She demonstrated paranoid ideation, impaired judgment, limited impulse control and poor insight into her condition. The Facility discharged her to return home the next day, with the agreement she would follow-up at the outpatient

2

clinic.  Upon discharge, her insight was assessed as fair, based on her agreement to continue her medications.

At trial, O.R. testified about the hospitalization.  She admitted she had been hallucinating.  She explained she had been smoking methamphetamine and thought people outside the house were going to kill her, so she called the police.  When she did not answer the door for the officers, they kicked in the door.  Her boyfriend told the officers she was schizophrenic and not taking her medications; the officers took her in for a mental evaluation.

Ten days after her release from the Facility, O.R. was admitted again under section 5150.  She demonstrated paranoid and somatic delusions, believing there were worms in her vagina and that people were poisoning her.  She reported having trouble with her boyfriend, taking a bus to Sacramento and sleeping outside.  She acknowledged her schizophrenia diagnosis and her need for medication.  She also acknowledged that without her medication she gets paranoid, confused and easily agitated.  Her insight and judgment were fair, with some understanding of her illness which could be improved.

The Facility discharged O.R. to the crisis residential treatment program, a less-restrictive placement.  O.R. agreed to follow up with the outpatient clinic.

The Facility subsequently admitted O.R. on another section 5150 hold in March 2011.  Her boyfriend contacted police and reported she was not compliant with treatment, was off her medication, was acting strange, and left the apartment without her shoes.  He said she was agitated and destructive, kicking down the front door, punching holes in the wall and throwing a hammer at him.  The boyfriend said they had been evicted and were homeless.  O.R. claimed her baby was the "devil, evil, he will destroy the world" and that her "husband hit me in the mouth with a silver hammer."  There was no evidence she had been hit.  O.R. accused the nurse of trying to kill her and asked the marriage and family therapist to kill someone for her.  She again tested positive for methamphetamine.  O.R.'s

judgment, insight and impulse control were poor. At discharge, she agreed to follow up with Narcotics Anonymous or Alcoholics Anonymous and the outpatient clinic.

Approximately one week after her release, the Facility admitted O.R. She claimed her boyfriend was trying to poison her and had tried to put a rod through her head. She said she was raped by aliens and had four aliens inside her. She believed her boyfriend was having her followed by people trying to harm her. She claimed her boyfriend was abusive and trying to murder her. She admitted smoking methamphetamine a few days earlier. Her insight and judgment were impaired. She had not been compliant with her medication and had actively been abusing illicit drugs, including methamphetamine. During the ensuing two-week hospitalization, she threatened to kill staff and claimed the staff had denied her medical treatment. She also stated the food made her sick and she could not sleep. The Facility discharged her to the Progress House, where she said she planned to stay until her delivery. She stayed at the Progress House no more than three days.

Approximately 10 days after her discharge, the Facility readmitted O.R. under section 5150. A motel manager had called law enforcement because O.R. was banging on doors. Law enforcement officers found her trying to open doors to the motel rooms. She was delusional, claimed someone was trying to kill her and that she was dying. O.R. was dehydrated and uncooperative. She reported she had been killed in the past and heard voices. Again, she had impaired insight and judgment and poor impulse control. After a 10-day hospitalization, the Facility discharged her to her mother's home. The Facility instructed her to contact the mental health department as soon as she delivered her baby. She gave birth and child protective services took the baby into custody. O.R. returned to live with her boyfriend.

The Facility again admitted O.R. in July 2011. O.R. had called 9-1-1 from a local drug store to report that her boyfriend hit her and was trying to kill her. She told responding officers she was shot in the head, but that was not true. She said her

boyfriend cut her vagina with a knife, but examination revealed no trauma. She was not taking medication for her condition. Her impulse control was very poor and her insight and judgment severely impaired. After nine days in the Facility, with treatment and medication, she was ready to return home and the Facility discharged her. She promised to follow-up with the outpatient clinic. She demonstrated fair insight and judgment.

Four days later, the Facility readmitted O.R. after she showed up at the child protective services office and demanded to see her child. She claimed people had put screws in her head, her boyfriend had killed her and police had broken her bones. Her impulse control was fair, but her insight and judgment were impaired. Her "hospital stay was characterized by her lack of insight and noncompliance with medication." Ultimately, her boyfriend agreed to take her back home and the Facility discharged her after 15 days of hospitalization. Her impulse control was marginal, insight limited and judgment impaired. The Facility referred her for aftercare and instructed her to comply with medication.

Two days later, the Facility readmitted O.R. She was "floridly psychotic" and admitted recent methamphetamine use. Her impulse control was fair, with poor judgment and insight. O.R. reported she tried to kill herself, she was impregnated by the devil, and George Bush saved her life. She was unable to form or follow a self-care plan and was "chronically non-adherent to treatment as offered." She made paranoid statements and had an altercation with the nursing staff. She was placed under arrest for assaulting a nurse and discharged from mental health to county jail.

The Facility readmitted O.R. in August 2011. An ambulance took her from her home for erratic and agitated behavior. She had been using methamphetamine and became verbally abusive to her boyfriend. She claimed her back was broken and her arm "blew up." After arriving at the emergency room, she continued to be aggressive and abusive to the nursing staff. She tested positive for methamphetamine. She was agitated during the intake interview and did not want to answer questions. Her impulse control

was poor and her insight and judgment impaired. During the month she was hospitalized, she was initially uncooperative with treatment, refused to take medications and became aggressive. She said she would live with her parents upon discharge, but her parents could not support her. She broke up with her boyfriend and did not have any other shelter. The crisis residential treatment program accepted her and she agreed to stay there. Her impulse control was fair, but her insight and judgment remained impaired.

The trial court granted the public guardian's request for a temporary conservatorship on September 30, 2011. O.R. remained at the Facility until October 20, 2011, when the conservator moved her to the crisis residential treatment program. In December 2011, the public guardian moved O.R. to a new facility called The New Beginning.

The deputy public guardian, Mari Robertson, testified as an expert. She reviewed the law enforcement and mental health records, interviewed treating physicians and mental health case managers, and also had numerous interviews with O.R. Based on her investigation, Robertson concluded O.R. was gravely disabled, and that without a conservatorship she would not be able to provide for her own food, shelter or clothing. Robertson based her opinion on O.R.'s history of hospitalization. There were many reports of medication noncompliance and mixing illicit drugs with her medication. O.R. was unable to maintain housing and was not compliant with treatment programs. She had been homeless and lived in a variety of locations. Robertson said the nine hospitalizations in 12 months were largely due to O.R.'s failure to take her medication. Before the temporary conservatorship, O.R. had not been medication compliant for more than 30 days. The former boyfriend obtained a restraining order against her.

O.R. asked to move to The New Beginning drug treatment program. She had been there before but never successfully completed the program. But within two months, O.R. called Robertson and said she wanted to leave the program. She said the program was "really weird" and she believed there were graves in the backyard.

6

O.R. did not have a specific housing plan and did not inform Robertson of the steps she would take to live independently.

Robert Bloom, the program coordinator for the El Dorado County Mental Health Department, qualified as an expert in the assessment of mental health clients. Bloom's involvement with O.R. began with her admission to the Facility. He noted that her admissions to the Facility followed a pattern. Her "psychosis was so pervasive and bizarre it made her incapable of meeting her basic needs of life. And even when she would clear, she would immediately return to a psychotic state either for lack of medicine or drug use." O.R.'s history of treatment, approximately eight hospitalizations in one year, some within days of the previous hospitalization, demonstrated she was "unable to sustain any margin of an independent lifestyle." Bloom said O.R. is gravely disabled.

O.R. testified she was currently living in a clean and sober treatment program. She said she was "told" she had a mental illness, "[s]o that's what I think, what the doctors tell me." When she is stressed or overwhelmed she hears voices in her head and becomes very fearful of people. She stopped taking her medications during her pregnancy because of the potential risks to the baby and she started having hallucinations. But she said she has been taking her medications from January 2011 to the date of the hearing. She said she is currently taking Zyprexa for her hallucinations and Wellbutrin for her depression. If the conservatorship ended, she would continue to take the medications because "the doctors feel that they help me, and I notice a helpful -- that they help me." She particularly found the Wellbutrin helpful, "[a]s far as Zyprexa, I just -- I'm going to keep taking it because the doctors told me to."

She thought The New Beginning drug treatment program was helpful, but she had a problem with the manager. If the conservatorship ended, she would need a different program due to her difficulties with the manager.

Her plan for housing is to obtain a newspaper and find an affordable apartment. She had been receiving $830 in social security income and thought the amount may have

7

gone up. She would not continue her prior pattern of hospitalization, because she is clean and sober, she is taking her medication, and she is no longer in the relationship with her boyfriend.

The trial court found: "There's been testimony with regard to homelessness during the past year almost every time that she was not in the [Facility] or the [crisis residential treatment program]. She thought in January, she admits to being homeless once, says that she didn't believe it was safe to go home. In March, apparently the record indicates that she was evicted. And she admits to have been sleeping out in the open at one time. So I don't see anything here that would indicate to me that she does have the ability to provide for shelter if she is released from the program that she's in now. [¶] She's also indicated that she would like to get out of that program. And more than that, with regard to her history of noncompliance, which is relevant under the statute, she's testified here today that she believes that she was complaint from January 11th until now. And the record certainly indicates that that is not the case."

The trial court granted the petition and found O.R. was gravely disabled.

                              DISCUSSION

O.R. contends there is no substantial evidence supporting the trial court's decision to grant a permanent conservatorship. She attacks the trial court's specific reasons, claiming they are not supported by the record. But "[i]f the decision of the trial court is correct on any theory of law applicable to the case, the appellate court will affirm the judgment, whether the trial court's reasons were correct or not. (*Pasadena Medi–Center Associates v. Superior Court* (1973) 9 Cal.3d 773, 779, fn. 6, superseded by statute on another issue.)" (*Estate of Kampen* (2011) 201 Cal.App.4th 971, 1000.)

In proceedings under the Act, the agency must prove beyond a reasonable doubt that the proposed conservatee is presently gravely disabled. (§ 5350; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235; *Conservatorship of Jones* (1989) 208 Cal.App.3d 292, 302–303.) O.R. challenges the sufficiency of the evidence to establish her grave

disability at the time of the hearing; that is, whether due to mental disorder, she "is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A); *Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.) In the face of such a challenge, we review the evidence in the light most favorable to the judgment and must affirm the judgment if there is substantial evidence to support it. (See *Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 697; *Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 (*Walker*); *Conservatorship of Isaac O.* (1987) 190 Cal.App.3d 50, 57.) We resolve all conflicts in the evidence, and make all reasonable inferences from the evidence, in favor of the judgment. (*Walker,* at p. 1577; *Isaac O.*, at p. 57.)

In determining whether an individual is gravely disabled, a trier of fact may not rely on a perceived likelihood that the individual will stop taking medication. But a history of failing to take prescribed mental health medication, coupled with a lack of insight into the individual's mental illness, may serve as the basis for making such a finding if the trier of fact determines the individual will not take her medication unless she is required to do so, and that her mental disorder makes her unable to provide for her needs for food, clothing or shelter. (*Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446–447 (*Guerrero*); *Walker, supra,* 206 Cal.App.3d at p. 1577.)

Robertson, Bloom and Dr. Price each concluded O.R. could not provide for her basic needs when she was not medicated. Between January 2011 and September 2011, there was no point, outside of a facility, when O.R. was medication compliant for more than 30 days. And each time she left a facility she refused outpatient services, failed to attend meetings and stopped taking her medication.

The examining doctors noted that O.R. has limited or poor insight into her mental illness. She vacillated between acknowledging she had a mental illness and denying it. At the hearing, she simply said she had been told she has a mental illness. She also said she would continue to take her medication because the doctors said she should. At no

9

point did she recognize that the failure to take her medication or comply with treatment was a contributing cause in her decompensation. Instead, she blamed her methamphetamine use and stress. She also claimed to have consistently taken her medication over the last year, but the record indicates otherwise.

O.R. had nine psychiatric hospitalizations in less than one year. When she was not living in a mental health, treatment or rehabilitation facility, she lived with either her boyfriend or her mother. When they could not provide housing she had no other shelter. There was no period of time when she was able to successfully live independently. In addition, O.R.'s mental illness caused her to feel unsafe and to be aggressive and destructive.

Where there is "substantial evidence the conservatee could not provide for [herself] without medication and that [s]he would not take [her] medication without the supervision of the conservator," there is substantial evidence of a grave disability. (*Guerrero, supra*, 69 Cal.App.4th at p. 446.) This record provides sufficient evidence that she is presently gravely disabled. (See *Walker, supra*, 206 Cal.App.3d at p. 1577.)

## DISPOSITION

The judgment is affirmed.


<u>          MAURO          </u> , J.


We concur:


<u>       BLEASE       </u> , Acting P. J.


<u>       MURRAY       </u> , J.