Filed 7/7/15  Conservatorship of E.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of E.B. | C077610 |
| BUTTE COUNTY PUBLIC GUARDIAN, | (Super. Ct. No. PR41155) |
| Petitioner and Respondent, | |
| v. | |
| E.B., | |
| Objector and Appellant. | |

E.B., a Lanterman-Petris-Short Act (LPS Act) conservatee, appeals the finding she is gravely disabled as a result of a mental disorder and is unable to provide for her basic personal needs of food, shelter, or clothing.  She claims there is not substantial evidence to support the finding of grave disability.  E. also contends there is not sufficient evidence to support the imposition of special disabilities denying her the rights and privileges to:

1

possess or carry firearms, possess a driver's license, enter into contracts, and give or withhold consent to medical treatment related to her grave disability. We affirm the trial court's findings.

### FACTS AND PROCEEDINGS

E. stopped taking her psychiatric medications in March of 2014. By August 2014, she was admitted to Butte County Psychiatric Health Facility (PHF) under Welfare and Institutions Code section 5150 (unless otherwise stated, statutory references that follow are to the Welfare and Institutions Code), after she reported she "was often witnessing murders and kidnappers and hearing voices saying they were going to drug and rape her." She remained at the PHF until September 8, 2014, when the hospital discharged her to a board and care facility. While there, she refused to take her medication, claimed she was allergic to all psychiatric medication, denied she had a mental illness, and maintained she did not need to take medication. She was readmitted to the PHF on September 17, after refusing to take her psychiatric medication.

Dr. Kimura, the inpatient psychiatrist and medical director at PHF, testified as an expert familiar with E. Behavioral counselor Lauren Wong worked with E., and also testified as an expert. The Butte County public guardian, Dustina Woods, met with E. several times and was familiar with her from past conservatorships. Each witness concluded E. was gravely disabled, as she was unable to provide for her basic needs of food, clothing, or shelter.

Dr. Kimura reviewed E.'s medical charts and history and diagnosed E. with schizoaffective disorder. When Dr. Kimura saw E. in September 2014, E. was suffering paranoid concerns. She believed she had been kidnapped and the PHF unit was unlawfully detaining her. Dr. Kimura noted E. had been conserved for many years. Her conservatorship was discontinued in April of 2013 and she had been doing well, living in her own place, and working part-time. She had also been traveling. During her travels,

she was psychiatrically hospitalized in Illinois.  She also went to Pennsylvania and ended up in a homeless shelter.

When she returned to California, she rented a room from a person "who probably was dealing with drugs and possibly has some prostitution issues."  The residents were "pushing meth on her and also wanting to have sex with her."  E. did not feel safe there. The home did not have a bathroom.

E. had difficulty living in reality.  She suffered grandiose delusions, including that she had trillions of dollars in the bank, and persecution delusions that people were out to get her.  She also suffered paranoid delusions, such as fears about her medications.

E. had not been compliant with her medication and refused all psychiatric medication.  She believed the medication was for erectile dysfunction, that the medications were poison, and that she was not required to take them.  E. had previously been stable on an injectable medication, but because she was delusional and unrealistic, she refused to take the medication.

Dr. Kimura opined E. lacked insight into her mental illness and was unwilling to consistently take her psychiatric medication.  Based on these factors, Dr. Kimura concluded E. was not able to provide for her own food, clothing, or shelter.

Wong observed E. had not shown insight into her mental illness, and consistently reported that her psychiatric medication was poison and was affecting her brain tumor. E. did not see a need for psychiatric medication, and did not believe she had a mental illness.  Based on the fact that when E. went off conservatorship, she stopped taking her medication and was unable to secure safe housing, Wong concluded E. could not provide for her own food, clothing, or shelter.

Woods also concluded E. needed to be conserved to ensure medication compliance and her safety in the community.  When E. was not medication compliant, she made poor decisions, chose an unsafe living environment, and was taken advantage of by others. Woods did not believe E. could provide for her own food, clothing, or shelter because she

3

did not have insight into her mental illness, refused her medication, did not believe she needed medication, and was not able to keep herself safe in the community.

At the time of the hearing, E. was compliant with medication and although there had been mild improvement, she still suffered paranoia, auditory hallucinations, and grandiose delusions. The PHF discharged her on September 8, 2014. Upon being released from PHF, E. wanted to go back to her previous apartment, where she was not safe. Instead, the public guardian arranged for E. to rent a room in a single family home. The counselor believed E. would benefit from a higher level of care to monitor her medication compliance. Medication compliance was the main issue on which E. needed support, her "other ideals seem to function quite well." E. was able to care for her hygiene and make medical appointments. She also appeared able to take care of her clothing needs and had food in her apartment.

Dr. Kimura also concluded E. should not be able to contract, possess firearms, or have a driver's license. As to the contracts, she noted E.'s paranoid delusions included that PHF workers falsified her information and used her accounts. She believed she had millions of dollars in her account. Accordingly, Dr. Kimura believed E. would not be able to make "rational and prepared, responsible decisions with her finances." As to the firearms, Dr. Kimura noted E. suffered from paranoid delusions and auditory hallucinations. The hallucinations included hearing voices telling her she is dead and voices that accused the social worker of killing people. These reasons also formed the basis for Dr. Kimura's conclusion that E. should not have a driver's license.

E. testified that she did not have a mental illness; rather she had a physical disability, a brain tumor. She stated Dr. Kimura had prescribed numerous medications and one of them, Abilify, caused heart attacks, claiming, "I'm going to have a heart attack four days in a row." She testified, when she has a heart attack, which happens frequently because of the psychiatric medication, she calls 911 and they bring her to the hospital. The medication also caused headaches and pancreatic disease. She did not

4

agree she needed the medication because it did not alter her thinking or emotions, was not good for her, and caused hormonal changes and other side effects.

E. reported she had $789 a month in social security disability income. She also had undisclosed amounts of income from retirement, and victim witness assistance. She had "a trillion dollars deposited in [her] bank account" as payment for her work providing political party representative assistance, representing people in the United States and the United Nations, and federal employees. She paid $400 per month in rent. She believed the mental health facility wanted to steal $600 from her. She also believed employees at the behavioral health facility stole her identification and used that information to steal $100 million dollars from her bank accounts. She did not agree she needed to be conserved because she did not need to be controlled, told where to live or how, and she had a right to refuse psychiatric medication. She denied that the social worker helped her get her apartment. E. reported she was able to use the kitchen where she lived and could prepare a variety of foods. She believed many of the people involved with the conservatorship were "involved in a conspiracy to hurt" her, and had stolen money from her.

The trial court found E.'s symptoms included auditory hallucinations, paranoia, and delusions. She accused others of stealing her money or forging her name to steal her property. E. had a history of homelessness and psychiatric hospital admissions, she had been conserved four times in Butte County, and due to her delusional state, was unable to state or make realistic plans to care for herself. She had been conserved until January 2014. Upon her release from conservatorship, she lost her housing and was living on the streets and at a homeless shelter. She later moved in with friends. The home had no bathroom, there was drug use and other illegal and dangerous activities occurring in the home, and other residents were taking her money. E.'s mental illness and inability to care for herself put her at risk of harm from herself or others. Accordingly, the trial court

5

found the county had met its burden of proof that E. was gravely disabled beyond a reasonable doubt and granted the conservatorship.

Specifically, the trial court found that as a result of a mental disorder and her unwillingness to accept treatment voluntarily, E. was unable to provide for her basic personal needs for food, clothing, or shelter.

At the hearing, the trial court also stated E. was "unable to provide for her personal needs when it comes to medication that address her most profound disability, that being her schizoaffective disorder. And when those medication needs are not addressed, it leads to consequences to her and to the government that only increase the cost of her care. [¶] So the court further finds that she is substantially unable to manage her finances when she is not under the prescribed medication for her primary disability to resist fraud or undue influence." E.'s counsel objected to the finding that the cost to the government was the basis for any finding. The trial court sustained that objection. The trial court also imposed special disabilities, precluding E. from possessing a driver's license, entering into contracts, refusing treatment related to her grave disability, and possessing a firearm.

DISCUSSION

I

*Grave Disability*

E. contends there is no substantial evidence supporting the conclusion that she is gravely disabled as a result of a mental disorder; specifically, she challenges the finding that her mental disorder renders her unable to meet her personal needs for food, clothing, or shelter. She argues there is not substantial evidence that she "cannot eat, dress, or take shelter."

In proceedings under the LPS Act to establish a conservatorship, the public guardian must prove beyond a reasonable doubt that the proposed conservatee is

6

presently gravely disabled. (§ 5350; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 234; *Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 696; *Conservatorship of Jones* (1989) 208 Cal.App.3d 292, 302–303.) As relevant in this case, "gravely disabled" is defined as "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A); *Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.)

When reviewing the establishment of a conservatorship, we employ the substantial evidence test to determine whether the record supports a finding of grave disability. We review the whole record in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence, that is, evidence that is reasonable, credible, and of solid value. Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 (*Walker* ).) "We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.) The testimony of a single witness may be sufficient to support such a finding. (*Conservatorship of Johnson, supra*, 235 Cal.App.3d at p. 697.)

"The conservator must show the conservatee is presently gravely disabled and not that he may relapse and become gravely disabled in the future. ([*Walker, supra*,] 206 Cal.App.3d [at p. 1577].) Where the evidence establishes a person is not presently gravely disabled, but may become so because of a future failure to take medication, an LPS conservatorship cannot be established. (*Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, 1034 [].) Similarly, an individual cannot be found gravely disabled merely because he will not voluntarily accept treatment. (*Conservatorship of Symington* (1989) 209 Cal.App.3d 1464, 1468 [].)" (*Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446.)

7

E. relies on *Conservatorship of Smith* (1986) 187 Cal.App.3d 903 to support her claim that "even were she to become homeless, that would not establish lack of shelter for purposes of LPS commitment." E. reads too much into *Smith.* It is true that Smith had no permanent home and as a result of her delusions, she slept on the sidewalk in front of the church at night. (*Id.* at p. 910.) In *Smith*, however, the examining psychiatrist concluded that Smith's "cognitive intellect and most of her personality was intact and, despite the disorder, she could feed and clothe herself and provide for her own place to live." (*Id.* at p. 907.) The *Smith* court also made clear additional evidence on the effect of Smith's behavior on her health and well-being might have changed its conclusion. (*Smith*, at p. 910.) By contrast, in this case, two experts and the public guardian testified E. was not able to provide for her own place to live as a result of her mental illness. Her history shows she was frequently homeless. The residence she lived in immediately prior to conservatorship was unsafe, other residents took advantage of her, pressured her to have sex, and were pushing her to use drugs. This evidence distinguishes E.'s case from *Smith.*

E. had a history of being conserved when she went off her medications. When not medicated, she suffered paranoid delusions, grandiose delusions, and auditory hallucinations. E. believed the psychiatric medications were poison. She refused to take the psychiatric medication, denied she had a mental illness, and claimed she did not need medication. After being released from her conservatorship, in April 2013 she was psychiatrically hospitalized in Illinois and ended up in a homeless shelter in Pennsylvania. Most recently, upon returning to California, she took up residence in an unsafe environment where she was being taken advantage of by other residents. The residence had no bathroom, the other tenants were dealing drugs, pushing drugs on her, and attempting to have sex with her. Left to her own devices, and without the social worker intervening and arranging for her current placement, E. would have returned to this unsafe environment.

Expert witnesses Dr. Kimura, and behavioral counselor Wong, both concluded E. lacked insight into her mental illness and would not take her medication if not conserved. They also each concluded E. was not able to provide for her own food, clothing, or shelter. Public guardian Woods further noted that when E. was not medicated she made poor decisions, including choosing an unsafe environment in which to live. This evidence, and the reasonable inferences from this evidence, support the conclusion that E. had no insight into her mental illness or need for medication and would not take her medication if she were not conserved. Furthermore, when she was unmedicated, she was unable to provide herself with safe shelter. Accordingly, there was substantial evidence to support the finding that E. was gravely disabled.

E. also argues the trial court applied the incorrect standard in announcing its ruling. It is true, the trial court's oral statement does not make reference to the statutory standard for determining grave disability. Nonetheless, the trial court also specifically made the finding that E. was gravely disabled because as a result of a mental disorder, she was unable to provide for her basic personal needs for food, clothing, or shelter. Furthermore, even if the trial court had stated the wrong standard, that error does not change our conclusion that *on appeal* there is substantial evidence supporting the conclusion that E. was gravely disabled. " ' "[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [].)" (*People v. Zapien* (1993) 4 Cal.4th 929, 976; *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 169, fn 29.)

9

## II

### *Special Disabilities*

E. next contends there is not sufficient evidence to support the imposition of the special disabilities denying her the rights and privileges to possess or carry firearms, possess a driver's license, enter into contracts, and give or withhold consent to medical treatment related to her grave disability.

A finding of grave disability alone is not sufficient to justify the imposition of the various special disabilities enumerated in section 5357. (§ 5005; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312–1313 (*Riese*).) The conservatee retains the rights and privileges covered by the special disabilities unless the court, after making separate findings of incapacity to support the imposition of the special disabilities, imposes those disabilities and confers corresponding authority on the conservator. (*Conservatorship of George H*. (2008) 169 Cal.App.4th 157, 165(*George H*.); *Riese, supra*, 209 Cal.App.3d at p. 1313.) Because the special disabilities deprive the conservatee of substantial constitutional rights, due process must be afforded before these rights are compromised. (§§ 5357, 5358; *Conservatorship of Christopher A*. (2006) 139 Cal.App.4th 604, 612.) " 'The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal.' [Citation.]" (*George H., supra*, 169 Cal.App.4th at p. 165.) In other words, there must be evidence in the record to support each of the specific disabilities imposed. (*Id.* at pp. 165–166.)

The trial court is not required to make "specific, on-the-record statement of the reasons for each order" regarding a special disability. (*George H., supra*, 169 Cal.App.4th at p. 165.) Nor does a petitioner for an LPS conservatorship need to address each special disability by unique evidence directed at a particular disability.

(*Ibid.*)  We will affirm the trial court's imposition of special disabilities so long as substantial evidence supports each disability.  (*Ibid.*)

*Right to Possess a Firearm* - To support a limitation on a conservatee's ability to possess a firearm or deadly weapon, the court must find "that possession of a firearm or any other deadly weapon by the person would present a danger to the safety of the person or to others."  (§ 8103, subd. (e)(1).)  As indicated above, E. was most recently committed under section 5150 on August 2014.  Accordingly, under section 8103, subdivision (f) she was restricted from possessing firearms for five years from that commitment.  Further, E.'s paranoid delusions included the belief she had been kidnapped, was being unlawfully detained by PHF, that people were out to get her, and that she witnessed murders and kidnappings.  She had auditory hallucinations that the social worker killed people.  This was substantial evidence from which the court could conclude E. could not safely possess a firearm.

*Right to Possess Driver's License* - Similarly, the overriding concern in the issuance of a driver's license is generally whether the person is able to operate a motor vehicle safely.  (Veh. Code, §§ 12800, subd. (g), 12805, subd. (c), 12806, subd. (c); *People v. Superior Court* (*Wilson*) (1993) 18 Cal.App.4th 31, 36-37.)  Mental disorders may affect a person's "ability to exercise reasonable and ordinary control in operating a motor vehicle" and may be the basis for refusing that person a driver's license.  (Veh. Code, §§ 12800, subd. (g), 12806, subd. (c).)  Dr. Kimura concluded E. should be denied the right to drive given her paranoid delusions and auditory hallucinations.  It was reasonable for the trial court to infer that E.'s delusions and hallucinations put her and others at risk if she were permitted to operate a vehicle.  This was substantial evidence supporting the conclusion she could not operate a motor vehicle safely.

*Right to Contract* - Under Civil Code section 1556, persons of "unsound mind" are not capable of entering into contracts.  There are essentially three classifications of incapacity based on an "unsound mind":  (1) entirely without understanding (Civ. Code,

11

§ 38); (2) unsound but not entirely without understanding; and (3) susceptible to undue influence. (Civ. Code, § 39; *Smalley v. Baker* (1968) 262 Cal.App.2d 824, 834-835, disapproved on another point in *Weiner v. Fleishman* (1991) 54 Cal.3d 476, 485-486.) Dr. Kimura indicated E. should be disabled from entering into contracts due to the effect of her delusions on her ability to make rational and responsible decisions regarding her finances. These delusions included the belief that she had millions or trillions of dollars in her bank account. E. had difficulty living in reality. When not medicated, others took advantage of her. The trial court could reasonably infer from this evidence that E. was not capable of entering into contracts.

*Right to Refuse or Consent to Medical Treatment Related to Grave Disability* - In *Riese*, the Supreme Court outlined the factors to be evaluated by the court in considering whether a gravely disabled person is incapable of making medical treatment decisions: "(a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . .; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes." (*Riese, supra*, 209 Cal.App.3d at pp. 1322-1323.) Using these criteria, the record supports the trial court's finding that E. was incompetent to make medical decisions related to her grave disability. E. denied she suffered from any mental illness. She refused medication and treatment related to her grave disability, including psychotropic medication. She believed the medications were poison that caused heart attacks, headaches, pancreatic disease, and hormonal changes. This is substantial evidence supporting the trial court's finding.

DISPOSITION

The judgment is affirmed.

      HULL      , Acting P. J.


We concur:


      MAURO      , J.


      RENNER      , J.