Filed 8/20/18; Modified and Certified for Partial Publication 9/12/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **Conservatorship of the Person of M.B.** | |
| **ALAMEDA COUNTY PUBLIC GUARDIAN,** | **A152586** |
|     **Petitioner and Respondent,** | |
| **v.** | **(Alameda County Super. Ct. No. RM16800412)** |
| **M.B.,** | |
|     **Objector and Appellant.** | |

M.B. (Minor) appeals from the order appointing the Alameda County Public Guardian (Public Guardian) as the conservator of her person pursuant to the Lanterman-Petris-Short Act (the Act or the LPS Act). (Welf. & Inst. Code, § 5000 et seq.)[1] Minor argues the order should be reversed because the conservatorship investigator failed to conduct an investigation of all available alternatives to conservatorship. She also contends the Public Guardian failed to prove she was gravely disabled, and there was

---

[1] All undesignated statutory references are to the Welfare and Institutions Code. Although the underlying petition refers to petitioner as the "Public Conservator," respondent's brief refers to petitioner as the "Public Guardian." We adopt the terminology used in respondent's brief.

1

insufficient evidence to support her placement at Star View Adolescent Center (Star View).  We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On March 30, 2017, the Public Guardian petitioned the superior court to establish a conservatorship of the person for Minor, who was admitted to John Muir Behavioral Health Center (John Muir) on March 16, 2017.  (§ 5352.)  Minor was 16 years old, and she was placed in the care of Alameda County's Child Protective Services (CPS) over a year earlier.  While a juvenile dependent, Minor suffered multiple involuntary hospitalizations.[2]  She presented at John Muir "with suicidal ideation and poor impulse control."

On the same day the petition was filed, the court appointed the Public Guardian as Minor's temporary conservator.  After a number of continuances, the court held a bench trial on the petition for appointment of a conservator on August 4 and 29, 2017.  Based on testimony from Minor, her psychiatrist, her child welfare worker, the conservatorship investigator, and her therapist, the court granted the petition.  The conservatorship will automatically terminate on August 29, 2018.

*Testimony of Minor's Psychiatrist*

Kira Ann Williams, M.D., an expert in psychiatry, was Minor's treating psychiatrist since her admission to Star View in April 2017.  Dr. Williams diagnosed Minor as suffering from "post-traumatic stress disorder, and [a] major depress[ive] disorder [that is] recurrent, severe, with psychotic features."  Minor heard voices telling her she had no reason to live.  Minor had a history of "very significant mood fluctuations[,] including depressive symptoms, auditory hallucinations, a lot of anxiety,

---

[2] The Welfare and Institutions Code authorizes an involuntary 72-hour detention of a person who "as a result of a mental health disorder, is a danger to others, or to himself or herself, or [is] gravely disabled[.]"  (§ 5150, subd. (a).)  This detention is often referred to as a "5150 hold."  After 72 hours, the individual may be certified for up to 14 additional days of intensive treatment if he or she is still gravely disabled or dangerous.  (§ 5250.)

frequent bouts of agitation and irritability, feelings of hopelessness, changes in her sleep patterns, flashbacks, [and] intrusive thoughts about a prior trauma. [¶] . . . [S]he had . . . 12 or 13 hospitalizations in the period from September 2015 until she was admitted to Star View in April of 2017." Minor threatened to tie a pillow case around her neck, and smother her roommate. Dr. Williams explained that Minor was the victim of a crime, and it is common for young victims of serious crimes to experience negative moods, and to feel that life has no point.

Dr. Williams testified that Star View consists of a community treatment facility (CTF) and a psychiatric health facility (PHF). The CTF has a school, and persons in the CTF can leave the building on group outings. The PHF is "a more acute facility." When Minor was first admitted to Star View on April 3, 2017, she was admitted to the PHF, but she transitioned to the CTF on June 1, 2017.

According to Dr. Williams, during her first two months at Star View, Minor was "doing quite well," but, around the middle of July 2017, she had "an acute change in her mental status." Minor experienced "some auditory hallucinations, . . . [felt] more depressed, . . . [and had] increased thoughts of wanting to hurt herself." She engaged in "superficial self-injury" by picking at old wounds, and she scratched herself "hard enough to draw blood." Minor voiced "suicidal intent," and mentioned to a staff member she did not feel safe without supervision. As a result of her "acute decompensation," Minor was placed on a "line-of-sight precaution," which meant a staff member could observe her at all times, except in the bathroom.

Dr. Williams opined that Minor's decompensation was triggered by a difficult conversation with her child welfare worker, and frustration with her mother, whom Minor felt "wasn't doing the things that she was required to do in order to get her back." At the time of Dr. Williams's testimony in August 2017, Minor was no longer on a line-of-sight precaution. Minor was prescribed a number of drugs, including an antipsychotic, and a drug for post-traumatic stress disorder.

3

Dr. Williams had no reason to think Minor would not take her medication if she was not at Star View. However, Dr. Williams opined that Minor was not ready for a lower level of care, "[e]specially given the more recent decompensation. The degree to which she kind of fell off of her trajectory is concerning. [¶] She still needs time to learn some appropriate coping skills, and not allow these disappointments to get her to a point where she thinks her life is not worth living." If Minor had been at home when her most recent decompensation occurred, Dr. Williams opined she would likely have ended up "back in a hospital setting." Minor was likely to leave an unsecured facility because "she desperately wants to be reunited with her mother." According to Dr. Williams, Minor had "a long way to go in terms of dealing with her trauma, and really addressing her feelings of guilt and shame around it."

*Testimony of Minor's Child Welfare Worker*

Angelique Hadden had monthly face-to-face meetings with Minor since becoming her child welfare worker in December 2015. During this time, Minor was hospitalized about 15 or 16 times pursuant to section 5150.

From February 2016 to June 2016, Minor was placed with her aunt in Stockton, California. While living with her aunt, Minor met with therapists and a support worker, and Minor's aunt was "open to all the supports." Minor had visits from her grandfather, and also one visit from her mother—who lived in Las Vegas, Nevada.

Nevertheless, Minor experienced about five involuntary hospitalizations during her placement at her aunt's home. Minor's aunt felt "overwhelmed," reporting that Minor wrote a suicide note. The aunt was raising two other children, one of whom stated she also wanted to kill herself, and the aunt's work schedule required her to commute each day from Stockton to the Bay Area. The aunt was concerned that Minor was often unsupervised.

After a group meeting involving Minor's aunt, mother, and her therapists, Minor was placed "in a group home, where she could have 24 hour supervision, for safety reasons[.]" Minor went to Charis Group Home (Charis), where she remained for almost six months, from June to December 2016. At Charis, Minor was placed in the "Level 14

4

group home," but, after about two months, she "step[ped] down to their Level 12 group home."[3]  However, Charis staff and therapists expressed concern about Minor's "suicidal ideation," and her desire "to leave the facility."  Minor was hospitalized twice, and she assaulted a nurse at Sutter Center Psychiatric Hospital (Sutter Hospital).  Charis requested Minor's removal from their program.

After Minor was released from Sutter Hospital, she went to Victor Treatment Center (Victor) in Stockton, California, which is a Level 14 group home.  Minor complained there were bed bugs.  While at Victor, Minor experienced a 5150 hold, and was taken to John Muir.  Although Victor was willing to take her back, a psychiatrist at John Muir requested a temporary conservatorship so that Minor could be placed at Star View, which requires its clients to be conserved.

Ms. Hadden was concerned that Minor was missing too much school because of her recurrent 5150 and 5250 holds.  As a result of these involuntary hospitalizations, Minor met with new doctors each time, who prescribed different medications.  Ms. Hadden determined Star View was the best facility for Minor "because they have the CTF side, as well as the PHF side.  And the times that I've worked with them, they're not generally ones to call for 51/50 holds. [¶] They're able to transition the youth from one side of the facility to the other, so that they can maintain their placement, they can also maintain their schooling."  Ms. Hadden believed that if Minor returned to Victor, or another Level 14 group home, then she would continue to suffer periodic involuntary hospitalizations.  If Minor returned to the home of her mother, "there could be possible re-traumatization just . . . being in that environment."

As Minor's child welfare worker, Ms. Hadden expressed "hope that she would be able to stay at Star View . . . [t]o stabilize her mental health, to continue with whatever recommendations they made for her medication, to . . . encourage . . . visitation with her mother, and . . . to stay in school consistently – she's missed a lot of school. . . . [¶] And,

---

[3] Based on the record, the difference between a Level 12 and a Level 14 group home is not clear.

again, with Star View, the hope would be that she would not have to leave the facility if she[ ] does have mental health episodes[.]"

*Testimony of Minor's Public Guardian Investigator*

Minor's public guardian investigator was Jillian Clarke, who wrote a report, and recommended a conservatorship for Minor because "it was necessary in order for her to be at Star View." Ms. Clarke stated the ultimate goal was to reunify Minor with her mother, and Star View—located in Torrance, California—was closer to her mother's residence in Las Vegas than any facility in Northern California, such as Victor. Ms. Clarke determined Minor needed to be in a locked facility—like Star View—based on her ideation of harming herself, not seeing the purpose of being alive, and based on incidents where Minor ran into traffic, and, on other occasions, scratched herself. The purpose of placing Minor at Star View was to avoid the disruption of repeated 5150 holds.

*Minor's Testimony*

Minor testified she felt like "a puppy locked in a cage" at Star View. She viewed Star View as similar to a jail. At Victor, Minor could take multiple showers each day and cook for the other residents. Minor testified that "at Victor, I probably self-harmed, like, one time. And I asked to be hospitalized, because I . . . [felt I could not] keep myself safe."

Minor initially wanted to go to Star View because her mother was only four hours away, but given that her mother had not visited her at Star View, she would rather return to Victor in Stockton, California, where her aunt lives, and where her mother was more likely to visit. While living with her aunt, Minor requested to be moved because Minor worried about being a bad influence on her niece, who expressed a desire to hurt herself. Minor admitted she sometimes felt suicidal, but sought help on those occasions.

*Testimony of Minor's Therapist*

Dr. Zohar Vaisman, who has a doctoral degree in psychology, testified that after Minor's decompensation, "she started not only having suicidal ideations, or suicidal statements, [but] she [also] actually engaged in self-harming behaviors, like cutting

6

herself, picking at her wounds, [and] claiming that she would commit suicide." Minor experienced auditory hallucinations. She told Dr. Vaisman she "had three different voices telling her to hurt herself, and one other voice telling her [to] harm her roommate, and this happened back in early July, maybe late June. . . ."

Dr. Vaisman testified Minor was improving for the last five or six weeks, and there had been no recent "incidents of self-harm behaviors . . . [or] lashing out at anyone[.]" Dr. Vaisman acknowledged, however, that Minor continued "expressing feelings of worthlessness, and negative self-talk, and hopelessness during our sessions." While Minor was eating appropriately, taking care of her hygiene, and dressing properly, it had been "incredibly frustrating" for Minor to realize she was not going to get well instantly and that she has a long road ahead of her in terms of her recovery. Minor had insight into what was needed for her treatment, and sought help when she felt suicidal, but Dr. Vaisman believed Star View was an appropriate facility, and an appropriate level of care, for Minor.

Based on this testimony, the court found that Minor was gravely disabled, and that "[g]rave disability clearly continues to exist, as does the danger to herself." The court ordered Minor to remain at Star View, and issued an order establishing an LPS conservatorship. Minor timely appealed.

## DISCUSSION

On appeal, Minor makes four arguments. First, based on an inadequate investigation of alternatives to conservatorship, Minor contends "[t]he order establishing the conservatorship . . . was not in accordance with the LPS Act and was unlawful." Second, based on the same inadequate investigation, Minor argues her due process rights were violated. Third, Minor contends the court's finding she was gravely disabled was not supported by substantial evidence. Fourth, Minor argues there was insufficient

evidence Star View was the least restrictive placement for Minor. We disagree and affirm.[4]

## I.

### *Governing Law and Standard of Review*

"A conservator of the person . . . may be appointed for a person who is gravely disabled as a result of a mental health disorder . . . . " (§ 5350.) "The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement (§ 5350.1)." (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142.) The Act also provides "[t]he officer providing conservatorship investigation shall investigate all available alternatives to conservatorship and shall recommend conservatorship to the court only if no suitable alternatives are available. This officer shall render to the court a written report of investigation prior to the hearing." (§ 5354, subd. (a).)

"In order to establish that a person is gravely disabled, the evidence must support an objective finding that the person, due to [a] mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter." (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.) "On review, we apply the substantial evidence test to determine whether the record supports a finding of grave disability. [Citation.] The testimony of a single witness is sufficient to support the trial court's finding." (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 697 (*Johnson*).)

---

[4] The Public Guardian moves to strike Minor's reply brief, which was filed seven days late on February 20, 2018. We grant the Public Guardian's request for judicial notice filed in support of the motion to strike. On the due date for her reply brief—February 13, 2018—Minor filed a request for an extension of time. On February 15, 2018, the Presiding Justice of Division Five denied the request. An appellant "must serve and file its reply brief, if any, within 20 days after the respondent files its brief." (Cal. Rules of Court, rule 8.212(a)(3).) Minor's counsel failed to do so. Therefore we grant the Public Guardian's motion to strike the untimely reply brief, and we have not considered it.

II.

*Investigation of Alternatives to Conservatorship*

On appeal, Minor focuses on the testimony of the public guardian investigator, arguing Ms. Clarke failed to investigate all available alternatives to conservatorship. Minor notes Ms. Clarke testified she did not consider all available alternatives to conservatorship. In addition, we note Ms. Clarke's report does not indicate she investigated alternatives to conservatorship.[5] By failing to do so, Minor contends Ms. Clarke failed to comply with the LPS Act, and violated Minor's due process rights.

We are not persuaded this argument provides a basis for reversing the court's order. On appeal, we focus on the court's decision to establish a conservatorship, not the conduct of the public guardian investigator. (See § 5352.4 [conservatee appeals "the court's decision to establish conservatorship . . . ."].) As Minor recognizes, the court acknowledged Ms. Clarke's investigation was inadequate, but nonetheless determined—based on the testimony of Minor's psychiatrist, therapist, and her child welfare worker—that Minor was gravely disabled and needed to be conserved. Assuming, without deciding, that the investigation of available alternatives to conservatorship was inadequate, we must decide whether it was error for the court to nonetheless establish a conservatorship.

We conclude the court did not err because, on this record, there was no substantial evidence that suitable alternatives to conservatorship were available. The alternatives were for Minor to be returned to the home of her mother, or her aunt, or for Minor to be placed in a Level 14 group home, like Victor. Minor could not be immediately returned to the care of her mother in Las Vegas because, according to Minor's child welfare worker, "there could be possible re-traumatization just . . . being in that environment." Similarly, Minor's psychiatrist testified that she did not think that "even the most responsible parent would be equipped to deal with the type of behavior that . . . [Minor] was displaying within the last couple of weeks."

[5] Ms. Clarke referred to a July 28 update to her original report, but only the initial report, not the update, is included in the record on appeal.

9

Returning Minor to the home of her aunt was not a suitable alternative because her aunt's work schedule meant Minor would often be left unsupervised, despite her mental health disorder. In addition, Minor testified she requested to be removed from her aunt's care because Minor worried about being a bad influence on her niece, who expressed a desire to hurt herself.

With regard to moving Minor back to a Level 14 group home—like Victor—the court considered this alternative and rejected it, stating it would be "abusive" given that Minor was likely to suffer further involuntary hospitalizations. At the August 29 hearing, the court admitted evidence regarding the services available at Victor, but determined Minor was better served by the additional resources available at Star View, including the ability to request one-on-one meetings with her therapist and line-of-sight supervision. The court acknowledged the disadvantages of "a locked facility" like Star View, but determined that "at this point, the issue of her . . . safety . . . [out]weighs the confinement aspects." The court was also concerned about the disruption to Minor's education caused by repeated 5150 holds.

We reject Minor's contention that the failure to investigate all available alternatives to conservatorship violated her due process rights. "[W]hen an individual is subjected to deprivatory governmental action, he [or she] always has a due process liberty interest both in fair and unprejudiced decision-making and in being treated with respect and dignity." (*People v. Ramirez* (1979) 25 Cal.3d 260, 268.) The significant liberty interests at stake in an LPS conservatorship proceeding require "strict application of the protective umbrella of the statutory procedures to all proposed conservatees. . . ." (*Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1566 (*Ivey*).)

Here, the court held two hearings, and was "interested in making this as complete a hearing as possible." Minor testified. Despite finding the investigation inadequate, the court determined a conservatorship was required based on the testimony of Minor's psychiatrist, therapist, and child welfare worker. As explained *ante*, the evidence indicates there was no suitable alternative to conservatorship for Minor. Accordingly, we discern no violation of Minor's due process rights. (*Ivey*, *supra*, 186 Cal.App.3d at p.

10

1566 [even though conservatorship investigator failed to mail report directly to proposed conservatee, there was "no reason to reverse an order that was made in a fair hearing."].)

III.

*There Was Sufficient Evidence Minor Was Gravely Disabled*

Next, Minor argues there was insufficient evidence she was gravely disabled, but Minor also suggests the court applied the wrong definition of grave disability. We begin with the statutory definitions.

A.    *The Statutory Definitions of Grave Disability*

Section 5008, subdivision (h)(1)(A), defines "gravely disabled" as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." However, section 5585.25 provides that " '[g]ravely disabled minor' means a minor who, as a result of a mental disorder, is unable to use the elements of life that are essential to health, safety, and development, including food, clothing, and shelter, even though provided to the minor by others." (§ 5585.25.) Although the two definitions are similar, Minor contends "the minor's definition" in section 5585.25 applies.

We disagree. As our Supreme Court explained, "[a]lthough a minor may not be legally responsible to provide for his [or her] basic personal needs, or may suffer disabilities other than a mental disorder which preclude him [or her] from so providing, the definition [found in section 5008, subdivision (h)(1)(A)] is nevertheless applicable. A minor is 'gravely disabled' within the meaning of section 5008, subdivision (h)(1), when the trier of fact, on expert and other testimony, finds that disregarding other disabilities, if any, the minor, because of the further disability of a mental disorder, would be unable to provide for his [or her] basic personal needs." (*In re Michael E.* (1975) 15 Cal.3d 183, 192, fn. 12 (*Michael E.*).)

Furthermore, the definition of "[g]ravely disabled minor" from section 5585.25 is not part of the LPS Act, but is found in the Children's Civil Commitment and Mental Health Treatment Act of 1988. (§ 5585.) This definition applies "only to the initial 72 hours of mental health evaluation and treatment provided to a minor. . . . Evaluation and

11

treatment of a minor beyond the initial 72 hours shall be pursuant to the . . . [LPS Act]." (§ 5585.20.) Accordingly, we must apply the definition found in the LPS Act, and determine whether there was substantial evidence Minor suffered from a mental disorder as a result of which she "would be unable to provide for [her] basic personal needs," if she had to so provide. (*Michael E.*, *supra*, 15 Cal.3d at p. 192, fn. 12.)

B.     *The Evidence of Minor's Grave Disability*

Minor contends there was insufficient evidence she was "presently gravely disabled." Minor argues her psychiatrist's testimony proved she "*might* become disabled in the future, not that she was presently unable to care for herself." (Original italics.) Relying on cases like *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, Minor argues she was medication-compliant and had "insight into her mental illness," which, according to Minor, undermines the court's determination she was presently unable to care for herself.

Preliminarily, we reject the Public Guardian's argument that Minor forfeited this issue by failing to raise it below. At the August 29 hearing, Minor's counsel argued that what Minor needed was "breaks where she is not locked up when she can handle it, and then being confined on an emergency basis when she decompensates." Thus, Minor's counsel argued she was not presently gravely disabled, but may become so in the future.

Nonetheless, we disagree with Minor's contention there was insufficient evidence of present grave disability. Minor's treating psychiatrist, Dr. Williams, diagnosed Minor as suffering from "post-traumatic stress disorder, and [a] major depress[ive] disorder [that is] recurrent, severe, with psychotic features." Dr. Williams described Minor's "acute decompensation" in mid-July 2017, which she viewed as "an indication that her depression . . . is not completely resolved." Dr. Williams described Minor's "ongoing attempts to scratch herself, and then the specific threat to tie a pillow case around her neck . . . ." Dr. Williams testified that Minor was prescribed a drug "[o]n Wednesday of last week . . . [because Minor] was complaining of the auditory hallucinations . . . ." This testimony addressed Minor's present condition, not her likely future condition.

12

Minor argues she "knew she suffered from severe depression which caused her to have suicidal ideations and she voluntarily took medication and learned and used coping skills to develop distress tolerance." But Minor's psychiatrist testified Minor "still needs time to learn some appropriate coping skills," and she had "a long way to go in terms of dealing with her trauma, and really addressing her feelings of guilt and shame around it." Similarly, Minor's therapist noted it had been "incredibly frustrating" for Minor to realize she was not going to get well instantly and that she has a long road ahead of her in terms of her recovery. This testimony indicates Minor had yet to learn appropriate coping mechanisms to deal with her mental health disorder.

This case is similar to *Johnson*, where the court found the testimony of a psychiatrist was sufficient to support a finding of grave disability. (*Johnson*, *supra*, 235 Cal.App.3d at p. 697.) In *Johnson*, a psychiatrist testified the appellant suffered 11 involuntary hospitalizations, experienced hallucinations, attempted suicide, lacked insight into her disorder, and had a history of noncompliance with taking prescribed medications. (*Ibid.*) Similarly here, there was evidence Minor suffered recurrent involuntary hospitalizations, experienced auditory hallucinations, and sometimes felt suicidal. Based on her own testimony, and that of her psychiatrist, therapist and child welfare worker, there was substantial evidence that, as a result of a mental health disorder, Minor "would be unable to provide for . . . [her] basic personal needs," if required to do so. (*Michael E.*, *supra*, 15 Cal.3d at p. 192, fn. 12.)[6]

IV.

*There Was Sufficient Evidence Star View Was the Least Restrictive Placement*

Minor's final argument is that the court's determination that Star View was the least restrictive placement for Minor was not supported by substantial evidence. Minor claims the least restrictive placement was a Level 14 group home, not a "locked facility" like Star View.

---

[6] Having concluded there was sufficient evidence of grave disability, we do not address other arguments made by the Public Guardian in its briefing and at oral argument.

We disagree. When a court determines a proposed conservatee is gravely disabled, it must "designate the least restrictive alternative placement for the conservatee." (*Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 351 (*Amanda B.*).) "For a conservatee who is gravely disabled, . . . placement in a suitable facility . . . means the least restrictive residential placement available and necessary to achieve the purpose of treatment. . . . After considering all the evidence the court shall determine the least restrictive and most appropriate alternative placement for the conservatee." (§ 5358, subd. (c)(1).) We apply the substantial evidence test when reviewing the court's factual findings. (*Amanda B.*, *supra*, at p. 351.)

Minor claims she "could be placed in a less restrictive placement than Star View in order for her to gain appropriate coping skills, consistently attend school and have consistent mental health treatment by the same doctors." But, when placed at Victor or Charis, Minor suffered involuntary hospitalizations, resulting in disruptions to her education and inconsistent medical treatment. Star View was a more appropriate placement for Minor because it did not require Minor to be hospitalized when she decompensated. Minor's psychiatrist testified Minor was not ready to move from Star View to a Level 14 group home, "[e]specially given the more recent decompensation." Minor's therapist did not believe Star View was too high a level of treatment for Minor. Accordingly, there was substantial evidence Star View was the least restrictive and most appropriate placement for Minor.

## DISPOSITION

The order appointing the Public Guardian as the conservator of Minor's person is affirmed.

14

_____

Jones, P.J.


We concur:


_____

Simons, J.


_____

Needham, J.

Filed 9/12/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of the Person of M.B. | |
| RANDY MORRIS, as Public Guardian, etc.,       Petitioner and Respondent, v. M.B.,       Objector and Appellant. | A152586 (Alameda County Super. Ct. No. RM16800412) |

**ORDER MODIFYING OPINION
AND CERTIFYING OPINION FOR PARTIAL PUBLICATION
[NO CHANGE IN JUDGMENT]**

**THE COURT:**

The opinion in appeal No. A152586, filed on August 20, 2018, was not certified for publication in the Official Reports. For good cause appearing, pursuant to California Rules of Court, rules 8.1105(b), (c), and 8.1110, the opinion is certified for partial publication. Accordingly, respondent's request for publication is GRANTED IN PART.

It is further ordered that the opinion filed on August 20, 2018, shall be MODIFIED as follows:

1.     The case title shall be replaced with the case title used in this order.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion parts II and IV.

1

2. On pages 1 and 2, the text of the first paragraph of the opinion shall be replaced with the new introductory paragraph below. The text of footnote 1 shall remain unchanged.

> M.B. (Minor) appeals from the order appointing the Alameda County Public Guardian (Public Guardian) as the conservator of her person pursuant to the Lanterman-Petris-Short Act (the Act or the LPS Act). (Welf. & Inst. Code, § 5000 et seq.)[1] We affirm. In the published part of this opinion, we reaffirm that when evaluating a request to establish an LPS conservatorship for a minor, courts should apply the definition of grave disability found in section 5008, subdivision (h)(1)(A). We conclude there was sufficient evidence Minor was gravely disabled. In the unpublished parts of this opinion, we consider Minor's argument that the order should be reversed because the conservatorship investigator failed to conduct an investigation of all available alternatives to conservatorship. Minor also contends there was insufficient evidence to support her placement at Star View Adolescent Center (Star View). We disagree.

The modification effects no change in the judgment.


Date:_____     _____

P.J.

Superior Court of Alameda County, No. RM16800412, Carol S. Brosnahan, Judge.

Suzanne Davidson, under appointment by the Court of Appeal, for Objector and Appellant.

Donna R. Ziegler, County Counsel, and Philip C. Ladew, Deputy County Counsel, for Petitioner and Respondent.