Filed 5/5/25  Conservatorship of the Person of C.O. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Conservatorship of the Person of C.O.. | |
| PUBLIC GUARDIAN OF SONOMA COUNTY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>C.O.,<br><br>    Defendant and Appellant. | A172178<br><br>(Sonoma County<br>Super. Ct. No. SPR097203) |

Defendant C.O. appeals the judgment following a court hearing reimposing conservatorship under the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.).[1]  C.O. contends the Public Guardian of Sonoma County (Public Guardian) failed to prove she is gravely disabled and the trial court erred when it granted the Public Guardian's petition to extend her conservatorship.  We agree and reverse the judgment and order of conservatorship.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

# I. BACKGROUND

## A.　Governing Law and Standard of Review

The LPS Act authorizes one-year conservatorships for those who are gravely disabled due to a mental health disorder.  (§ 5350.)  " '[G]ravely disabled' " is defined as "[a] condition in which a person, as a result of a mental health disorder, a severe substance use disorder, or a co-occurring mental health disorder and a severe substance use disorder, is unable to provide for their basic personal needs for food, clothing, shelter, personal safety, or necessary medical care."  (§ 5008, subd. (h)(1)(A).)

This definition does "not require a finding that a proposed conservatee cannot provide for her food, clothing, *and* shelter."  (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 135 (*Carol K.*).)  " 'Personal safety' means the ability of one to survive safely in the community without involuntary detention or treatment . . . ."  (§ 5008, subd. (p).)  " 'Necessary medical care' " is defined as "care that a licensed health care practitioner . . . determines to be necessary to prevent serious deterioration of an existing physical medical condition that, if left untreated, is likely to result in serious bodily injury . . . ." (*id.*, subd. (q)), meaning "extreme physical pain, substantial risk of death, or protracted loss or impairment of function of a bodily member, organ, or of mental faculty" (§ 15610.67).  Nonetheless, "[t]he clear import of the LPS Act is to use the involuntary commitment power of the state sparingly and only for those truly necessary cases where a 'gravely disabled' person is incapable of providing for his basic needs either alone or with help from others." (*Conservatorship of Smith* (1986) 187 Cal.App.3d 903, 908 (*Smith*); see also *Conservatorship of Early* (1983) 35 Cal.3d 244, 253 ["imposition of a conservatorship should be made only in situations where it is truly necessary"].)

2

The statute is intended to promote and balance "a variety of private and public interests." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 540 (*Ben C.*).) On one hand, the LPS Act's object is "[t]o guarantee and protect public safety" (§ 5001, subd. (c)) and "[t]o protect persons with mental health disorders . . . from criminal acts" and harm. (*Id.*, subd. (g).) On the other hand, it is designed "[t]o end the inappropriate, indefinite, and involuntary commitment of persons with mental health disorders . . . " (*id.,* subd. (a)) and "[t]o safeguard individual rights through judicial review" (*id.*, subd. (d)). "The purpose of protecting the mentally disordered person must be read in concert with the purpose of ending the *inappropriate, indefinite and involuntary* commitment of such persons." (*Conservatorship of Early*, *supra*, 35 Cal.3d at p. 253; accord *Conservatorship of Kevin M.* (1996) 49 Cal.App.4th 79, 89 [" 'The LPS Act represents a delicate balance "between the medical objectives of treating sick people without legal delays and the equally valid legal aim of insuring that persons are not deprived of their liberties without due process of law" ' "].)

LPS proceedings threaten significant individual liberty interests. (*Ben C.*, *supra*, 40 Cal.4th at p. 540.) "Accordingly, the Legislature and [the courts] have built several layers of important safeguards into conservatorship procedure." (*Ibid.*) "Before a person may be found to be gravely disabled and subject to a year-long confinement, the LPS Act provides for a carefully calibrated series of temporary detentions for evaluation and treatment." (*Id.* at p. 541.) Eventually, as here, proceedings may be initiated to determine whether the conservatee should be involuntarily confined for up to one year. (*Ibid.*; §§ 5350, 5361.) Among the procedural safeguards attendant to such proceedings are the right to a jury trial (§ 5350, subd. (d)(1)), the right to counsel (§ 5365), and a requirement that " '[t]he party seeking imposition of

3

the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt and the verdict must be issued by a unanimous jury.'" (*Ben C.*, at p. 541.)

A conservatorship "shall automatically terminate" after one year, but the conservator "may petition . . . for reappointment . . . for a succeeding one-year period." (§ 5361, subds. (a), (b); accord *Public Guardian of Contra Costa County v. Eric B.* (2022) 12 Cal.5th 1085, 1095–1096, 1104.) Such a petition "shall include the opinion of two physicians . . . who have a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders that the conservatee is still gravely disabled . . . ." (§ 5361.) "The conservatee . . . may, upon advice of counsel, waive the presence . . . of the physician . . . who recommended conservatorship . . . and of the physician providing evaluation or intensive treatment. In the event of such a waiver, such physician . . . shall not be required to be present at the hearing if it is stipulated that the recommendation and records of such physician or other professional person concerning the mental condition and treatment of the conservatee or proposed conservatee will be received in evidence." (§ 5365.1.)

For a renewal petition to succeed, grave disability must be proven beyond a reasonable doubt. (*Ben C., supra*, 40 Cal.4th at p. 542.) " 'In order to establish that a person is gravely disabled, the evidence must support an objective finding that the person, due to [a] mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter.' [Citation.] 'On review, we apply the substantial evidence test to determine whether the record supports a finding of grave disability. [Citation.] The testimony of a single witness is sufficient to support the trial court's finding.'

4

[Citation.]" (*Conservatorship of M.B.* (2018) 27 Cal.App.5th 98, 106.) Substantial evidence also "includes circumstantial evidence and the reasonable inferences flowing therefrom." (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 (*Walker*) [" 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt' "].)

### B.     Public Guardian's Failure to File a Respondent's Brief

The Public Guardian filed a letter in this Court stating it would not file a respondent's brief. "Although it is the appellant's duty to show error, the respondent has a corresponding obligation to aid the appellate court in sustaining the judgment or order." (*Goldstein v. Barak Construction* (2008) 164 Cal.App.4th 845, 849, fn. 1.) Here, the Public Guardian has chosen to shirk that obligation.

We recognize there are often "scarce fiscal and manpower resources" available to public guardians. (*Smith*, *supra*, 187 Cal.App.3d at p. 911.) But if there was error in the proceedings, the government should concede it rather than gamble on a potential miscarriage of justice. "[F]reedom is openly on trial at a civil commitment proceeding." (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223.) We may treat Public Guardian's failure to file a brief as "an acknowledgement that the appeal is well taken and reverse the trial court's orders." (*Goldstein v. Barak Construction, supra*, 164 Cal.App.4th at p. 849, fn. 1; see Cal. Rules of Court, rule 8.220(a)(2).) But in light of the competing interests at stake in commitments under the LPS Act, we have undertaken to examine the record and consider the arguments advanced in C.O.'s brief.

5

## C.    Prior Conservatorship Proceedings[2]

C.O. was involuntarily committed in November 2022.  She was detained upon her pre-trial release after being arrested for a misdemeanor charge of "Under the Influence and Disorderly Conduct."  C.O. was placed in custody pursuant to section 5150, which authorizes a three-day hold if specified public officials determine someone "is a danger to others, or to themselves" on account of "a mental health disorder."  (§ 5150, subd. (a).)  After her hold was extended for 14-days pursuant to section 5250, she was placed on a 30-day hold pursuant to section 5270.15 on the grounds she was " 'very paranoid, having persecutory delusions, intrusive, responding to internal stimuli, disassociating, isolative, unable to cooperate in the interview, unable to form viable plan for self-care in least restrictive environment.' "

In December 2022, the Public Guardian filed an ex parte petition seeking appointment as temporary and "permanent" conservator for C.O., pursuant to chapter 3 of the LPS Act (§ 5350 et seq.).  The petition alleged that C.O. was gravely disabled because she was "unable to provide for her basic personal needs for food, clothing, or shelter as a result of a mental disorder, and [was] incapable of accepting treatment voluntarily."  The Public Guardian attached the declaration of Dr. Talvinder Rana in support of the petition.  Dr. Rana diagnosed C.O. with "[s]chizoaffective disorder bipolar type and [post-traumatic stress disorder] PTSD" and attested that C.O. had been "readmitted for the third time since 8/5/2022 for grave disability

---

[2] To provide the procedural background of C.O.'s commitment we take judicial notice of the record filed in C.O.'s dismissed appeal from *Public Guardian Of Sonoma County v. C.O.* (Super. Ct. Sonoma County, 2024, No. SPR097203).  (Evid. Code, §§ 452, subd. (d), 459, subd. (a); see *Conservatorship of Jones* (1989) 208 Cal.App.3d 292, 296.)

secondary to her mental illness." The trial court appointed the Public Guardian as C.O.'s temporary conservator "pending the final determination on the petition for appointment of a permanent conservator" and issued letters of temporary conservatorship. C.O. was detained throughout the proceedings pursuant to sections 5352.1 and 5361.

C.O. waived a jury trial, and the trial court heard the petition in January 2023. It found C.O. to be gravely disabled due to a mental disorder and reappointed the Public Guardian as her conservator for one year. The court set "the least restrictive placement" to be a locked facility, but it scheduled a hearing five months out to revisit the issues. The court found conservatorship was still appropriate at the five-month hearing and continued the matter to August 2023, when it again left the conservatorship in place.

In November 2023, the Public Guardian filed a timely petition pursuant to section 5361 and sought an extension of C.O.'s conservatorship. The trial court again granted the petition and extended the conservatorship another year to December 2024.[3]

The trial court held status hearings during 2024, as well as a hearing after C.O. requested termination of the conservatorship. The court denied C.O.'s termination request in September 2024, and C.O. appealed. (*Public Guardian Of Sonoma County v. C.O.* (Super. Ct. Sonoma County, 2024, No. SPR097203) [app. dism. by order].) In January 2025, C.O.'s counsel filed an opening brief pursuant to *Ben C.*, *supra*, 40 Cal.4th at page 544, informing this Court that counsel found no arguable issues. This Court issued a letter

---

[3] The minute order states that the court found "the least restrictive placement" to be a board and care facility, but in the order after hearing it was "ORDERED that the least restrictive placement for the conservatee" was a locked facility.

to C.O. inviting her to file a letter regarding the issues. But neither the Court nor C.O.'s counsel was able to reach her, and the appeal was therefore dismissed.

### D. December 2024 Reappointment of Conservator

During the pendency of C.O.'s appeal, the Public Guardian again timely petitioned for reappointment as conservator of C.O. under section 5361, subdivision (b). Based on declarations by Drs. Phillip Grob and Susan Ahart in August and September of 2024, respectively, the Public Guardian asserted that C.O. was "still gravely disabled as a result of a mental disorder" and still required a conservatorship. Dr. Grob's declaration diagnosed C.O. with schizoaffective disorder bipolar type and PTSD, described her symptoms as "highly disorganized, labile . . . delusional and demonstrates bizarre behaviors, e.g. undressing in public," and stated that she was "unable to safely care for herself in the community." Dr. Grob stated that C.O. had no insight to her mental illness and, if not for the conservatorship, she would stop taking her medications "and be at risk for harm."

C.O. objected to the reappointment and again requested the conservatorship be terminated. She waived her right to a jury trial, and the trial court heard the petition.

At the hearing, the Public Guardian called Dr. Gary Bravo as a witness. C.O. stipulated that Dr. Bravo was a board-certified psychiatrist. Dr. Bravo testified that he had known C.O. in a professional capacity for two years, reviewed her recent medical records, and met with her earlier that same day for approximately five minutes. He explained that he cut the interview shorter than normal because C.O. "seemed very angry and . . . hostile" and because she gave curt answers. For example, when he asked C.O. about her release plans, she responded, " 'None of your business.' " When he asked her if she was mentally ill, she answered, " 'No.' "

8

Dr. Bravo opined that C.O. was "presently gravely disabled" due to her underlying diagnosis of schizoaffective disorder and post-traumatic stress disorder, and he opined the least restrictive placement for her was a locked facility. If unmedicated, he opined her symptoms would include emotional lability, extreme dysregulated behavior, psychotic behavior, assaultive behavior, and delusions. He testified that he personally observed her "current symptoms of emotional lability" and that "on the unit she's quite—quite labile and emotionally deregulated." He further opined that C.O. lacks insight to her mental illness and would not take her medications if her conservatorship was terminated. Dr. Bravo based these conclusions, at least in part, on C.O.'s previous noncompliance with treatment and statements, as well as an episode less than three weeks earlier in which "she refused her meds" and said " 'If you give me a shot, I will kill myself.' " Dr. Bravo's testimony was received without objection.

At the close of Dr. Bravo's testimony, counsel for the Public Guardian affirmed it had "[n]o more witnesses or evidence."

C.O. testified on her own behalf. She testified that her name was Amber Realynn Smith.[4] When asked what she planned to do if she was no longer conserved, she responded, "[g]et the fuck away from you people." When asked if there was a specific place she intended to reside, she said, "[a]nywhere but with—in a mental hospital or any type of hospital, just anywhere."

C.O. testified that she had enough money to buy "everything" that she needed. But when asked how much money that was, she answered, "[d]oes it matter?" When her attorney replied it would be helpful information, she

_____

[4] The Conservatorship Investigative Report completed in 2022 states that "Smith" was C.O.'s father's surname.

9

responded, "I, as an American citizen, can do whatever the fuck I want to." She asserted that she had access to food stamps, SSI, and "like unlimited" money.

C.O. admitted, however, that she lacked sufficient clothing, but she claimed it was due to the "facility" not allowing her to buy clothing. She repeated that she had the money. Likewise, she asserted the conservator would not let her buy her own food, makeup, meals, or a phone. When asked if there was anything else she wanted the court to be aware of, she responded, "I want them to be aware that I want to leave right now."

C.O.'s counsel did not call any other witnesses or introduce any other evidence. The Public Guardian declined the trial court's invitation to offer a closing argument, while C.O.'s counsel reiterated that C.O. "stated that she believe[d] she can take care of herself."

The trial court granted the petition and extended C.O.'s commitment one year until December 8, 2025. Although C.O.'s possible special disabilities under section 5357 were not addressed during the hearing, the court's written order denied her the privilege of possessing a driver's license, the right to possess a firearm, and the right to refuse or consent to medical treatment relating to her disability. C.O. appealed.

## II. DISCUSSION

C.O. contends the Public Guardian failed to present substantial evidence to prove she was gravely disabled. Specifically, C.O. argues that there is no evidence showing that she cannot secure her own food, clothing, or shelter. We agree.

C.O. does not deny she suffers from a mental disorder and concedes "the opinion of one expert is enough to affirm a judgment imposing an LPS conservatorship." Instead, C.O. argues that Dr. Bravo's testimony was

insufficient to establish she cannot provide for her own basic survival needs. She challenges the evidentiary bases of Dr. Bravo's opinions. C.O. also argues none of Dr. Bravo's testimony related to her ability to take care of herself. On the latter point, she is correct.

As the Public Guardian's only witness, Dr. Bravo, testified to C.O.'s underlying mental illness, her symptoms in the absence of medication, and her history of failing to voluntarily take her prescribed medicines. He further opined that C.O. would not take her medication on her own because she lacked insight to her own mental illness, which he based on her statements to him in interviews. But nowhere did he state that C.O. was incapable of providing for her own basic needs. He did not state that her medications were necessary to prevent serious bodily injury. Nor did he tie C.O.'s mental illness, or her lack of insight into her illness, to any such inability to care for herself or to her endangerment.

These omissions are dispositive. " 'Psychosis, bizarre or eccentric behavior, delusions or hallucinations are not enough, by themselves, to find that [a person] is gravely disabled.' " (*Conservatorship of K.P.* (2021) 11 Cal.5th 695, 705, quoting Judicial Council of California Civil Jury Instruction No. 4002.) Indeed, "the 'only' question at trial is whether the proposed conservatee is **unable to provide for essential needs due to** a mental illness." (*Conservatorship of K.P.*, at p. 712, boldface added.) The Public Guardian did not present a scintilla of evidence that, despite C.O.'s symptoms, she could not take care of herself.

Moreover, even if a rational factfinder may conclude, beyond a reasonable doubt, that a proposed conservatee cannot provide for his own needs or safety, the petitioner still must make a showing that the cause of a person's inability to care for himself is "as a result of" mental illness. (§ 5008,

11

subd. (h)(1)(A).)  There is case law suggesting that expert opinion is necessary for the factfinder to reasonably draw such a connection.  (See *Conservatorship of Torres* (1986) 180 Cal.App.3d 1159, 1163 ["Although a juror might know whether a person was able to take care of his basic needs a juror cannot determine from common experience whether that inability results from a mental disorder or from some other reason"].)

Dr. Bravo's failure to testify about causation distinguishes this matter from otherwise analogous cases, such as *Walker*, *supra*, 206 Cal.App.3d 1572. Like Dr. Bravo, the government's expert in *Walker* opined the conservatee lacked insight to his mental illness and therefore would stop taking his medications if the conservatorship terminated.  (*Id.* at p. 1576.)  But in contrast to Dr. Bravo, the expert in *Walker* further opined that "[w]ithout the medication, [the conservatee] would become agitated so that he would be unable to take care of his own physical needs."  (*Ibid.*; see also *Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446–447 [finding of grave disability sufficiently supported by psychiatric testimony that conservatee will not take medication without supervision and cannot care for himself but for medication].)  Dr. Bravo's testimony failed to connect the dots in the same way.

There is no record that C.O. waived the presence of Drs. Phillip Grob and Susan Ahart, the physicians who recommended renewing the conservatorship, nor did C.O. stipulate that their records could be received into evidence.  (§ 5365.1.)  The exclusion of their statements is not a problem because Dr. Bravo was entitled to "rely on hearsay including statements made by the patient or by third persons" when he testified as to C.O.'s mental

12

capacities. (*Conservatorship of Torres*, *supra*, 180 Cal.App.3d at p. 1163.)[5] The problem is that his testimony, that is the only evidence in the record supporting the order, left out a key ingredient concerning causation. We need not resolve whether expert testimony or medical records are necessary to prove the cause of a person's inability to care for herself because the Public Guardian failed to adduce *any* such evidence during the December 2024 commitment hearing.

We are aware of our duty to " 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Walker*, *supra*, 206 Cal.App.3d at p. 1577; see *Conservatorship of M.B.*, *supra*, 27 Cal.App.5th at p. 106 [same].) But a cold record is rarely a substitute for the ability to observe the demeanor and credibility of the witnesses and parties. It is possible that C.O.'s own testimony supplies circumstantial evidence from which, when coupled with Dr. Bravo's testimony, a rational trier of fact could find beyond reasonable doubt that C.O. was unable to adequately care for herself due to her mental illness. (Cf. *Carol K.*, *supra*, 188 Cal.App.4th at pp. 134–135 [stating that conservatee's "own testimony . . . touched on the triad underlying grave disability: food, clothing, and shelter"].) But the Public Guardian declined to make any such argument on appeal, and we will not make one for it.

Moreover, the trial court did not state the basis for its grave disability finding either during the hearing or in its written order. It also did not state the basis for its determination regarding C.O.'s special disabilities. Likewise,

---

[5] Given our conclusion, we need not address C.O.'s contention that the "evidentiary factual basis supporting Bravo's opinion" was "based upon undisclosed and unadmitted hearsay and an astonishingly brief telephone conversation with [C.O.]."

the Public Guardian "overlook[ed] [its] burden of producing evidence to support the special disabilities which [it] sought. [It] failed to even address the issue during the hearing." (*Walker*, *supra*, 206 Cal.App.3d at pp. 1578–1579 [remanding matter for further proceedings concerning special disabilities].) In sum, both the hearing and the resultant order suffered several defects.

We have some misgivings about C.O.'s ability to live free of conservatorship. Her testimony revealed disorganized thinking and possibly false impressions about how she could support herself. Multiple physicians believe that C.O. needs further professional psychiatric help and will not seek it out if the conservatorship is terminated. But each petition for reappointment of a conservator must be resolved independently of any conservatorship that preceded it. (§ 5361; *Ben C.*, *supra*, 40 Cal.4th at p. 543 ["focus [is] primarily on the conservatee's current needs and progress, rather than on a retrospective consideration of conditions that may no longer exist"].) And here, the Public Guardian failed to meet its burden.

Our holding addresses only the evidentiary deficiencies in the hearing on the December 2024 conservatorship petition. "We do not say, however, that from a more complete record [C.O.] could not be adjudicated 'gravely disabled.' However, the limited testimony adduced at trial compels our conclusion today." (*Smith*, *supra*, 187 Cal.App.3d at p. 910.) C.O., like every conservatee, has "[a] right to treatment services which promote [her] potential . . . to function independently" as well as all "the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California . . . ." (§ 5325.1.)

## III.  DISPOSITION

The trial court's judgment and order of a one year conservatorship until December 8, 2025, is reversed.

_____
SIGGINS, J.

WE CONCUR:


_____
BROWN, P.J.


_____
STREETER, J.


Public Guardian of Sonoma County v. C.O. (A172178)